UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AVA DOCK,

                Plaintiff,

                -against-

RESEARCH FOUNDATION OF THE STATE
UNIVERSITY OF NEW YORK,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Ava Dock ("Ms. Dock" or "Plaintiff"), by and through her attorneys, Stockli Greene Slevin & Peters, LLP, submit the following as and for her Complaint against the Defendant, Research Foundation of the State University of New York ("RF"), in the above-captioned matter.

**PRELIMINARY STATEMENT**

1.    This is a whistleblower retaliation action pursuant to the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, and the Major Frauds Act, 18 U.S.C. § 1031.  Plaintiff is a computer programmer/analyst employed by RF's Center for Development of Human Services ("CDHS") and a whistleblower who has uncovered RF's commission of major fraud upon the federal government with regard to an ongoing audit of the Medicaid program, in conspiracy with certain officials at the New York State Department of Health ("DOH").  This Medicaid fraud is the subject of an ongoing federal criminal investigation.  Plaintiff is a witness for the federal government in this investigation and she has provided the federal government with documentary

evidence of a pervasive and unlawful conspiracy among her supervisors at RF to defraud the federal government with regard to approximately $22,000,000,000 in annual matching funds which the federal government provides to New York for the Medicaid program.  Because of her whistleblowing activities, Plaintiff has been subjected to unrelenting retaliatory conduct by her supervisors at RF, including adverse employment reviews, alteration of her job duties, reassignment of work away from Plaintiff, suspension from work, and other discriminatory treatment.  Some of the adverse treatment initially began after Plaintiff invoked her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, but it increased significantly after Plaintiff objected to the fraudulent and criminal activity that she observed at RF.

## JURISDICTION AND VENUE

2. This Court has jurisdiction of the instant matter pursuant to 28 U.S.C. § 1331.

3. Venue is proper pursuant to 28 U.S.C. § 1391(b) because RF maintains a principal place of business in this District, and because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in this District.

## PARTIES

4. Plaintiff is a citizen of the State of New York, residing in the County of Albany, New York.

5. Upon information and belief, Defendant RF is a private, nonprofit educational corporation organized and existing under the laws of the State of New York, with a principal place of business at 35 State Street, Albany, New York.

**GENERAL ALLEGATIONS**

6.      This lawsuit has been necessitated by RF's pattern of retaliation and harassment against the Plaintiff for her whistleblowing activities relating to RF's fraud and criminal conduct with regard to ongoing audits of DOH's implementation of the federal Medicaid program. These audits – known as the Payment Error Rate Measurement ("PERM") and/or Medicaid Eligibility Quality Control ("MEQC") programs (the "PERM/MEQC Project") – are designed to measure New York State's implementation of payments in the Medicaid program. Under federal law, New York State can be penalized for excessive error rates in the authorization of Medicaid payments through the disallowance of all or part of the approximately $22 billion in federal matching funds for Medicaid which New York receives each year. RF has a contract with the New York State Department of Health ("DOH") to conduct the PERM and/or MEQC audits on behalf of DOH.

7.      According to RF's website, RF is not a New York State agency or public authority; however, upon information and belief, RF has agreements in place with the State of New York pursuant to which RF implements and/or performs certain state actions within the meaning of applicable law.

**PLAINTIFF'S EMPLOYMENT HISTORY**

8.      Plaintiff was hired by RF as a programmer/analyst for the PERM/MEQC Project in September of 2007.

9.      Initially, Plaintiff was one of two qualified programmer/analysts employed by RF for the PERM/MEQC Project.

-3-

10. In February of 2008, Plaintiff became ill and she was hospitalized for approximately two weeks. Upon her discharge from the hospital, she requested and received medical leave from RF. Instead of taking a complete leave of absence, Plaintiff worked from home 30 hrs a week.

11. When Plaintiff returned from her medical leave on March 25, 2008, she presented her medical limitations to her supervisors. Her medical condition was and is considered to be a disability within the meaning of the ADA.

12. Upon returning from medical leave, Plaintiff began to experience harassment related to limitations upon her ability to work that were caused by her disability. Plaintiff advised her supervisor of this mistreatment.

13. In April 2008, Plaintiff's former supervisor was replaced by a new manager ("Supervisor A").

14. Upon information and belief, Supervisor A had authority to make decisions with regard to the terms and conditions of Plaintiff's employment with RF.

15. Upon information and belief, Supervisor A was a "policymaker" with regard to the PERM/MEQC Project.

16. Upon information and belief, Supervisor A and associated RF staff did not believe that Plaintiff was entitled to any accommodation for her disability.

17. Supervisor A and associated RF staff harassed and discriminated against Plaintiff because of the limitations on her work performance that resulted from her disability.

18. Plaintiff complained about this mistreatment to the designated human resources person at RF, but the harassment continued.

19. RF offered Plaintiff no accommodation or medical leave to the Plaintiff, nor was she made aware of her rights regarding the ADA or FMLA.

20. Ultimately, Plaintiff became aware of her rights under the FMLA and ADA and requested certain reasonable accommodations, which were necessitated by her disability.

21. As a result, Supervisor A and associated RF staff began to harass Plaintiff and to retaliate against Plaintiff for exercising her rights under the ADA and FMLA.

22. Plaintiff lodged complaints with RF's human resources managers about Supervisor A's conduct; however, the retaliation and harassment continued. Plaintiff has lodged an administrative complaint relating to this discrimination, and that complaint is currently pending.

23. At or about the same time that Supervisor A became Plaintiff's supervisor, Plaintiff learned that the other programmer/analyst assigned to the PERM/ MEQC Project had resigned.

24. Plaintiff learned that RF had hired a former RF auditor, Co-Worker #1, as the replacement programmer/analyst.

25. Although she was initially supportive of the decision to hire Co-Worker #1 (because Plaintiff had been told that Co-Worker #1 was an experienced programmer), Plaintiff subsequently became concerned about the ability of this employee to maintain the integrity of the PERM/MEQC Project databases because Plaintiff learned that Co-Worker #1 had no prior

experience as a programmer. Plaintiff was concerned about whether Co-Worker #1 might intentionally and/or unintentionally manipulate data, causing inaccuracies with the audit information and systems.

26. Plaintiff's supervisors, including Supervisor A, had previously informed her that they held her directly accountable for the integrity of the information maintained in the databases.

27. In addition, as described below, Plaintiff was the RF employee who was responsible for reporting audit results to the federal government.

28. Plaintiff expressed her concern about the hiring of Co-Worker #1 to her supervisors, including Supervisor A.

29. Plaintiff's concerns were ignored by her supervisors and she was criticized for raising them.

## FRAUD UPON THE FEDERAL GOVERNMENT THROUGH THE PERM/MEQC PROJECT

30. Upon information and belief, in October 2008, RF learned that the Office of the Inspector General of the U.S. Department of Health and Human Services ("OIG") would be conducting an audit of the PERM/MEQC Project.

31. As a programmer/analyst, Plaintiff was the RF employee responsible for creating and maintaining the databases that would be audited by the OIG.

32. Plaintiff had created the databases at issue in a manner designed to ensure the integrity of the information which had been entered by the PERM/ MEQC Project auditors (the "Auditors").

33. The Auditors were also employees of RF.

34. One of the measures that Plaintiff took to ensure the integrity of the information in the PERM/MEQC Project databases was to restrict the ability of RF employees to alter data which had been input by the Auditors.

35. RF submits its results from the PERM/MEQC Project via the PERM Eligibility Tracking Tool ("PETT"). PETT is a website via which states may submit their PERM reporting forms to the federal government.

36. Only two staff members from each State are permitted to register for the PETT website and have access to upload or input data.

37. Plaintiff was at all relevant times one of the two RF employees designated to have access to upload or input data to the PETT site on behalf of the State of New York.

38. Supervisor A was the other RF employee designated to have access to the PETT site on behalf of the State of New York.

39. Although the instructions associated with the PETT site instruct users to maintain the secrecy of their passwords, Supervisor A regularly shared her password with other RF employees.

40. Although the instructions associated with the PETT site instruct users to maintain the secrecy of their passwords, Supervisor A directed Plaintiff to share Plaintiff's password with other RF employees, including Co-Worker #1.

41. In a meeting that occurred in November 2008, Plaintiff was instructed by her supervisors to delete certain data fields from the PERM/MEQC Project databases.

42. Supervisor A was one of the supervisors who provided this instruction to Plaintiff.

43. Upon information and belief, the purpose for the deletion of these data fields was to alter the information that would be provided to the OIG auditors, and to alter the case files presented for this audit.

44. Upon information and belief, Plaintiff's supervisors at RF intended to under-report New York State's Medicaid error rate so that New York would continue to receive federal matching funds for the Medicaid program.

45. In doing so, upon information and belief, RF intended to defraud the federal government and to impede the OIG audit of the PERM/MEQC Project.

46. Plaintiff objected to the request that she delete the data fields, expressing her belief that to do so would compromise the integrity of the data in the PERM/MEQC Project databases.

47. Upon information and belief, as a result of Plaintiff's objections, Supervisor A began to exclude Plaintiff from meetings relating to the OIG audit.

48. Supervisor A also began to falsely accuse Plaintiff of being disruptive in the workplace, and of not being a "team player."

49. In March 2009, Supervisor A gave Plaintiff a false and defamatory employment review, in which she falsely accused Plaintiff of threatening other RF employees (among other false accusations).

50. Among other things, Supervisor A falsely accused Plaintiff of being "unpredictable" and "confrontational" in her dealings with co-workers.

51. Supervisor A also falsely stated that Plaintiff had been "manipulative and particularly harsh" in communications with her supervisor and co-workers.

52. Supervisor A also falsely stated that Plaintiff "has sometimes resorted to dishonest and disturbing actions which seem to be motivated by unwillingness to accept guidance and direction and an inappropriate level of need of control."

53. Upon information and belief, Supervisor A falsely accused Plaintiff of such behavior, in whole or in part, because Plaintiff was objecting to RF's attempts to manipulate the data in the PERM/MEQC Project databases for purposes of under-reporting the error rate for New York's implementation of the Medicaid program.

54. Plaintiff responded to this false evaluation in writing, and refuted each allegation of misconduct.

55. Due to this false employment evaluation, Plaintiff was placed upon a six-month probationary period by RF.

57. While Plaintiff continued to perform her job functions in a positive and helpful manner, Supervisor A continued to falsely accuse Plaintiff of misconduct.

58. Supervisor A wrote monthly evaluations of the Plaintiff which falsely accused her of numerous employment infractions.

59. Plaintiff prepared a written response to each of these monthly evaluations, specifically refuting each false allegation of misconduct.

60. Supervisor A continued to issue these false evaluations during Plaintiff's entire six-month probationary period

61. In early August 2009, Plaintiff's supervisors, including Supervisor A, shifted all of Plaintiff's job duties to Co-Worker #1.

62. When Plaintiff asked what she should be doing at work, Plaintiff's supervisors, including Supervisor A, directed Plaintiff to respond to "help tickets."

63. There were no "help tickets" for Plaintiff to respond to because, upon information and belief, Plaintiff's supervisors, including Supervisor A, had directed RF employees to bypass the "help ticket" system and to submit such requests directly to Co-Worker #1.

64. Upon information and belief, Supervisor A, did so because she believed that Plaintiff was providing information and/or other assistance to the OIG auditors.

65. Upon information and belief, representatives of RF asked the OIG auditors whether Plaintiff was providing them with information about RF's fraudulent and criminal activities.

66. Plaintiff was, in fact, cooperating with the OIG auditors and had provided them with evidence that confirmed that RF had prepared a second set of PERM/MEQC Program audit documents for submission to the federal government. That second set of audit documents, which deleted data fields and replaced case files, falsely under-reported the error rate for New York's implementation of the Medicaid program.

67. While New York's error rate was actually in excess of twenty (20) percent, RF submitted documents to the federal government that purported to show that New York's error rate was at or near the maximum permitted error rate of three percent (3%).

68.     Upon information and belief, RF's purpose in attempting to under-report New York's error rate for Medicaid claims was to defraud the federal government with regard to the PERM/MEQC Project, in order to avoid the disallowance of federal matching funds for Medicaid to New York.

69.     RF's conduct in regard to the PERM and MEQC programs constitutes "major fraud" within the meaning of 18 U.S.C. § 1031, among other crimes.

70.     RF's conduct with regard to the PERM/MEQC Project constitutes "health care fraud" within the meaning of New York law.

### **OBSTRUCTION OF FEDERAL CRIMINAL INVESTIGATION**

71.     On or about June 24, 2009, Plaintiff was directed by her supervisor, Supervisor B, to lift the security on the PERM/MEQC Project database which prevented anyone from altering data other than the person who had input it.

72.     On or about June 24, 2009, Plaintiff lifted the auditor specific security on the PERM/MEQC Project database. This allowed the RF supervisors to alter and/or delete the data and specific findings which had been entered by the Auditors with regard to the PERM/MEQC Project.

73.     On or about July 1, 2009, Plaintiff met with the supervising auditor for the PERM/MEQC Project, Supervisor C, who directed her to lift the auditor specific security on a second PERM/MEQC Project database. This allowed the RF supervisors to alter and/or delete the data and specific findings which had been input by the Auditors with regard to the PERM/MEQC Project.

74. Upon information and belief, the purpose for requiring Plaintiff to lift the audit specific security was to make it appear as though the Auditor who had originally input the data was making the changes.

75. Plaintiff's supervisors directed her to lift this security even though they knew that there was an ongoing federal audit of the PERM/MEQC Project.

76. On July 1, 2009, Plaintiff informed Supervisor B of Supervisor C's instructions. Plaintiff also informed Supervisor B that "I think it is important to state that in this manner the change is recorded as the actual auditor making the change, not the supervisor."

77. Upon information and belief, on July 13, 2009, DOH was served with a federal subpoena relating to an ongoing federal investigation of the PERM/MEQC Project. The subpoena demanded production of emails and computer data, as well as hard copy files and notes and memoranda of meetings relating to the PERM/MEQC Project (the "DOH Subpoena").

78. On July 16, 2009, counsel for DOH issued a memorandum to certain RF employees, including Plaintiff, which informed the employees that DOH had received a federal subpoena. The memorandum further instructed the employees: "please be aware that it is a federal offense to alter, delete, or destroy" any of the items requested in the subpoena.

79. Upon information and belief, on July 13, 2009, RF was served with a federal grand jury subpoena relating to the federal investigation of the PERM/MEQC Project (the "RF Subpoena").

80. On July 16, 2009, RF counsel issued a memorandum (the "RF Subpoena Memorandum") which instructed all RF employees to preserve records relating to the

-12-

PERM/MEQC Project.  While the RF Subpoena Memorandum did state that "[i]t is of the utmost importance that we retain and preserve documents and electronic information that may be relevant to this subpoena[,]" the RF Subpoena Memorandum concluded by advising RF employees that "[y]ou should refrain from discussing this matter, or any related matters, with anyone outside of The Research Foundation.  If you are contacted by any person outside of The Research Foundation please refer such persons to the Research Foundation's Office of General Counsel[.]"

81. On or about August 4, 2009, RF counsel issued a memorandum regarding the ongoing federal investigation of RF (the "August 4 Memorandum").  In the August 4 Memorandum, RF counsel stated that "You cannot be punished in any way by the USAO [the U.S. Attorney's Office] if you decide that you do not want to meet or talk with them.  If at any time you feel threatened or intimidated by anyone from the USAO, I ask that you immediately report the threat to me.  Prosecutors and investigators often attempt to induce people to talk to them."

82. On or about August 12, 2009, Plaintiff was directed by RF to meet with RF's outside legal counsel under threat of termination, allegedly for purposes of assisting RF in preparing its response to the RF Subpoena.

83. Plaintiff requested that her counsel be permitted to accompany her to the meeting with RF's legal counsel.

84. By letter dated August 18, 2009, RF (through its outside legal counsel) denied Plaintiff's Counsel's request to accompany her to the meeting with RF's outside legal counsel (the "August 18 Letter").

85. In the August 18 Letter, RF's outside legal counsel stated to Plaintiff's Counsel that RF "respectfully denies your request to be present while counsel for [RF] assists it in conducting its internal investigation by interviewing Ms. Dock. … [Y]our presence during the interview very well may hinder the investigation."

86. The August 18 Letter also repeated the threat that "if your client chooses not to participate in the interview process, she, like all employees of [RF], will be subject to sanctions up to, and including, termination."

87. On or about August 19, 2009, Plaintiff received an email from RF which stated that RF "will not be reapplying for the PERM/MEQC contract for the 2010 project year and as a result all employees assigned to this contract will be terminated from employment effective December 31, 2009."

88. Plaintiff met with RF's outside legal counsel on August 24, 2009.

89. The alleged purpose of this meeting with legal counsel was to purportedly allow RF to gather information necessary to respond to the RF Subpoena.

90. According to the August 18 Letter, Plaintiff was being interviewed because "[RF] is conducting an internal fact-finding in order to ensure that it is able to comply with a federal grand jury subpoena, assist a federal investigation, and understand what the issues may be."

91. During the meeting, RF's outside legal counsel asked Plaintiff few, if any, questions relating to the gathering of information in response to the RF Subpoena.

92. Instead, RF's outside legal counsel challenged Plaintiff's opinions regarding the lawfulness of RF's pervasive alteration and falsification of data relating to the PERM/MEQC Project.

93. RF's outside legal counsel also acted in a manner so as to threaten Plaintiff, accusing her of submitting false information to the federal government because she was the RF employee with access to the federal PETT system.

94. Plaintiff recorded the interview by RF's outside legal counsel with outside counsel's consent.

95. Following this interview with RF's outside legal counsel, Plaintiff experienced further retaliation.

96. Plaintiff, along with other RF employees, received a memorandum informing her that her position would be terminated due to the expiration of the PERM/MEQC Project contract between RF and DOH.

97. At the same time that Plaintiff was being told that her position was being terminated, RF advertised her position as available to be filled without informing prospective applicants that the term of the position allegedly was to end on December 31, 2009.

98. RF also provided "replacement" positions for other RF employees who were affected by the alleged termination of the PERM/MEQC Project contract between RF and DOH.

99. Plaintiff was removed from email distribution lists relating to the PERM/MEQC Project.

100. Plaintiff was deprived of all opportunities for meaningful work at RF.

101. Plaintiff was placed on administrative leave.

102. Plaintiff's personal effects were removed from her work station.

103. Plaintiff attempted to obtain information relating to her employment status from RF, but her requests for information were ignored.

104. Upon information and belief, RF intends to terminate Plaintiff's employment.

105. Upon information and belief, RF intends to terminate Plaintiff's employment in retaliation for Plaintiff's whistleblowing activities.

### First Cause of Action – False Claims Act Retaliation (31 U.S.C. § 3729)

106. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

107. 31 U.S.C. § 3729(a)(1) provides, in relevant part, that "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim … is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461), plus 3 times the amount of damages which the Government sustains because of the act of that person."

108. RF's actions with regard to the PERM/MEQC Project constitute a "false claim" and/or the making, using or causing "to be made or used, a false record or statement material to a false or fraudulent claim" within the meaning of 31 U.S.C. § 3729(a)(1).

109. 31 U.S.C. § 3730(h) provides, in relevant part, that "[a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter."

110. By reason of the foregoing, Plaintiff took action in furtherance of a federal False Claims Act enforcement action, within the meaning of 31 U.S.C. § 3729(a)(1), 31 U.S.C. § 3730(h), and applicable case law.

111. Defendant knew that Plaintiff was engaging in this protected conduct.

112. Defendant retaliated against Plaintiff, in whole or in part, because of Plaintiff's protected conduct.

113. Plaintiff suffered damages as a result of Defendant's retaliation, including, but not limited to, lost wages, physical and emotional damages, humiliation, stress, anguish and attorneys' fees.

114. Accordingly, Plaintiff demands judgment the Defendant, including damages in an amount to be proven at trial, but believed to be in excess of $250,000.00, costs and attorneys' fees.

## Second Cause of Action – Major Fraud Act Retaliation (18 U.S.C. § 1031)

115. Plaintiff repeats and realleges each of the foregoing allegations as if fully set forth herein.

116. 18 U.S.C. § 1031(a) provides, in relevant part that "[w]hoever knowingly executes, or attempts to execute, any scheme or artifice with the intent (1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in any grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance …, if the value of such grant, contract, subcontract, subsidy, loan, guarantee, insurance, or other form of Federal assistance, or any constituent part thereof, is $1,000,000 or more shall, subject to the applicability of subsection (c) of this section, be fined not more than $1,000,000, or imprisoned not more than 10 years, or both."

117. RF's actions with regard to the PERM/MEQC Project constitute a scheme to defraud the United States government with regard to the $22 billion in federal matching funds for Medicaid which New York receives each year within the meaning of 18 U.S.C.A. § 1031.

118. 18 U.S.C. § 1031(h) provides, in relevant part, that "[a]ny individual who (1) is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by an employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of a prosecution under this

section (including investigation for, initiation of, testimony for, or assistance in such prosecution), and (2) was not a participant in the unlawful activity that is the subject of said prosecution, may, in a civil action, obtain all relief necessary to make such individual whole."

119. By virtue of the foregoing conduct, Plaintiff engaged in lawful acts "in furtherance of a prosecution" under 18 U.S.C. § 1031.

120. Defendant knew that Plaintiff was engaging in this protected conduct.

121. Defendant retaliated against Plaintiff, in whole or in part, because of Plaintiff's protected conduct.

122. By reason of the foregoing, RF suspended, threatened, harassed, and otherwise discriminated against Plaintiff in the terms and conditions of her employment by taking the above described adverse employment actions because of lawful actions done by Plaintiff in her efforts to assist a federal Major Fraud Act enforcement action, within the meaning of 18 U.S.C. §1031 and applicable case law.

123. Plaintiff suffered damages as a result of Defendant's retaliation, including, but not limited to, lost wages, physical and emotional damages, stress, anguish and attorneys' fees.

124. Pursuant to 18 U.S.C. §1031(h), the damages to which Plaintiff is entitled include "reinstatement with the same seniority status such individual would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees."

Accordingly, Plaintiff demands judgment the Defendant, including damages in an amount to be proven at trial, but believed to be in excess of $250,000.00, costs and attorneys' fees.

WHEREFORE, the Plaintiff demands judgment against the Defendant as follows:

(1) On Plaintiff's First Cause of Action, judgment against Defendant and in favor of Plaintiff in an amount to be proven at the trial of this action, but believed to be in excess of $250,000.00;

(2) On Plaintiff's Second Cause of Action, judgment against Defendant and in favor of Plaintiff in an amount to be proven at the trial of this action, but believed to be in excess of $250,000.00;

(3) All fair and reasonable costs, disbursements and attorneys' fees; and

(4) Such other relief as may seem just and equitable to the Court.

Date: October 23, 2009
    Albany, New York

STOCKLI GREENE SLEVIN & PETERS, LLP

By: _s/ Donald T. Kinsella
    Donald T. Kinsella (Bar Roll No. 103149)
    John D. Hoggan, Jr. (Bar Roll No. 511254)
    *Attorneys for Plaintiff*
    90 State Street
    Albany, New York 12207
    (518) 449-3125